CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS SEP -6  PM 4: 20
DALLAS DIVISION

EPUTY CLERK _____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| vs. | § | |
| | § | No. 3:12-CR-0054-L |
| JACQUES ROY, M.D. (1) | § | (Supersedes Indictment returned February 21, 2012) |
| CYNTHIA STIGER (2) | § | |
| WILBERT JAMES VEASEY, JR. (3) | § | |
| CYPRIAN AKAMNONU (4) | § | |
| PATRICIA AKAMNONU, R.N. (5) | § | |
| TERI SIVILS (6) | § | |
| CHARITY ELEDA, R.N. (7) | § | |

## SUPERSEDING INDICTMENT

The Grand Jury charges:

At all times material to this Superseding Indictment, unless otherwise specified:

### General Allegations

1.      The Medicare Program ("Medicare") was a federal healthcare program

providing benefits to persons who were over the age of 65 or disabled.  Medicare was

administered by the United States Department of Health and Human Services ("HHS")

through its agency, the Centers for Medicare & Medicaid Services ("CMS").  Individuals

receiving benefits under Medicare were referred to as Medicare "beneficiaries."

2.      The Texas State Medicaid program ("Medicaid") was a federally and state

funded program providing benefits to individuals and families who met specified

financial and other eligibility requirements, and certain other individuals who lacked

1

adequate resources to pay for medical care. CMS was responsible for overseeing the Medicaid program in participating states, including Texas.

3.      Medicare and Medicaid were "health care benefit programs," as defined by Title 18, United States Code, Section 24(b).

4.      "Part A" of the Medicare program covered certain eligible home healthcare costs for medical services provided by a home healthcare agency ("HHA") to beneficiaries requiring home healthcare services because of an illness or disability causing them to be homebound. Payments for home healthcare medical services under Medicare Part A were typically made directly to a HHA or provider based on claims submitted to the Medicare program for qualifying services that had been provided to eligible beneficiaries, rather than to the beneficiary.

5.      CMS did not directly pay Medicare Part A claims submitted by Medicare-certified HHAs. CMS contracted with different companies to administer the Medicare Part A program throughout different parts of the United States. In the State of Texas, CMS contracted with Palmetto GBA ("Palmetto") to administer Part A HHA claims. As administrator, Palmetto received, adjudicated and paid claims submitted by HHA providers under the Part A program for home healthcare claims.

6.      "Part B" of the Medicare program covered physician services and other ancillary services not covered by Part A. Under certain circumstances, Medicare Part B covered the cost of "home visits" for evaluation and management services provided to beneficiaries by a physician or, in some circumstances, a nurse practitioner or physician's

assistant, in a private residence. To reimburse for home visits, Medicare required that the medical records document the medical necessity of making a home visit in lieu of an office or outpatient visit.

7.     As with Part A claims, CMS did not pay Medicare Part B claims directly to the Medicare-certified physicians that submitted them. CMS contracted in Texas with Trailblazer Health Enterprises (Trailblazer) to administer Part B claims. As administrator Trailblazer received, adjudicated and paid claims submitted by physicians under the Part B program for, among other things, home visits.

8.     Physicians, clinics and other healthcare providers, including HHAs that provided services to Medicare beneficiaries, were able to apply for and obtain a Medicare "provider number." A healthcare provider that was issued a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare identification number, the services that were performed for the beneficiary, the date the services were provided, the cost of the services, and the name and identification number of the physician or other healthcare provider that ordered the services.

9.     Medicare Part A and Part B regulations required HHAs and physicians providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as

records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the providers.

10.     These medical records were required to be sufficient to permit Medicare, through Palmetto and Trailblazer, to review the appropriateness of Medicare payments made to providers under the Part A and Part B programs.

11.     The Medicare program paid 100% of the allowable charges for participating HHAs providing home healthcare services only if the patient qualified for home healthcare benefits.  A patient qualified for home healthcare benefits only if the patient:

a.     was confined to the home, also referred to as homebound;

b.     was under the care of a physician who specifically determined there was a need for home healthcare and established the Plan of Care ("POC"); and

c.     the determining physician signed a certification statement specifying that:

    i.     the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy;

    ii.     the beneficiary was confined to the home;

    iii.     a POC for furnishing services was established and periodically reviewed; and

    iv.     the services were furnished while the beneficiary was under the care of the physician who established the POC.

12.     Among the written records required to document the appropriateness of home healthcare claims submitted under Part A of Medicare was a POC that included the physician order for home healthcare, diagnoses, types of services, frequency of visits,

4

prognosis, rehabilitation potential, functional limitations, activities permitted, medications, treatments, nutritional requirements, safety measures, discharge plans, goals, and physician signature. Also required was a signed certification statement by an attending physician certifying that the patient was confined to his or her home and was in need of the planned home healthcare services, and an assessment of the beneficiary's condition and eligibility for home health services, called an Outcome and Assessment Information Set ("OASIS").

13.     Medicare Part A regulations required provider HHAs to maintain medical records of each visit made by a nurse, therapist, and home healthcare aide to a beneficiary. The record of a nurse's visit was required to describe, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the patient, any teaching and the understanding of the patient, and any changes in the patient's physical or emotional condition. The home healthcare nurse, therapist and aide were required to document the hands-on personal care provided to the beneficiary if the services were deemed necessary to maintain the beneficiary's health or to facilitate treatment of the beneficiary's primary illness or injury. These written medical records were generally created and maintained in the form of "visit notes" and "home health aide notes/observations."

14.     Among the written records required to document the appropriateness of home visit services claimed under Part B of Medicare were documentation supporting the medical necessity for the service and verifying that the service was performed on the date

listed in the claim submitted by the identified performing provider or incident to that provider.

## The Defendants

### JACQUES ROY, M.D.

15.     **Jacques Roy, M.D.**, a resident of Rockwall, Texas, was a medical doctor licensed by the State of Texas. **Jacques Roy, M.D.** became a doctor in 1984. **Jacques Roy, M.D.** and a family member owned and operated Medistat Group Associates, P.A. ("Medistat") doing business as Healthcare Medical Associates.

16.     Medistat was a Texas corporation located in DeSoto, Texas, incorporated on or about July 1990. Medistat was an association of healthcare providers that primarily provided home health certifications and performed patient home visits. Medistat consisted of four doctors and approximately fifteen nurses with varying levels of professional expertise. Between January 2006 and November 2011, Medistat certified more Medicare beneficiaries for home health services and had more home health patients than any other medical practice in the United States.

17.     **Jacques Roy, M.D.** and, at his direction, other Medistat physicians, certified and recertified POCs so that HHAs were able to bill Medicare for home health services that were not medically necessary and not rendered.

18.     **Jacques Roy, M.D.** and, at his direction, other Medistat physicians and nurse practitioners, performed unnecessary home visits and ordered unnecessary medical

services for the Medicare beneficiaries certified for home health services by **Jacques Roy, M.D.** or another Medistat physician.

19.     From January 1, 2006 through November 30, 2011, **Jacques Roy, M.D.** or another Medistat physician certified more than 11,000 unique Medicare beneficiaries for home health services provided by over 500 HHAs.  Medistat and the HHAs billed Medicare and Medicaid for over $375 million for these beneficiaries.

CYNTHIA STIGER
WILBERT JAMES VEASEY, JR.

20.     **Cynthia Stiger** and **Wilbert James Veasey, Jr.** residents of Dallas, Texas, were the owners of Apple of Your Eye Health Care Services, Inc. ("Apple").  Apple was a HHA located in Dallas, Texas, doing business in and around Dallas County.  Approximately sixty-nine percent (69%) of Apple's patients were certified for home healthcare services by **Jacques Roy, M.D.** or another Medistat physician.

21.     **Cynthia Stiger** and **Wilbert James Veasey, Jr.** submitted fraudulent claims to Medicare for home health services that were not medically necessary.  From January 1, 2006 through July 31, 2011, Apple submitted claims to Medicare totaling approximately $9,282,680.07 for services for Medicare beneficiaries certified by **Jacques Roy, M.D.** or another Medistat physician.

CYPRIAN AKAMNONU
PATRICIA AKAMNONU, R.N.

22.     Defendants **Cyprian Akamnonu** and **Patricia Akamnonu, R.N.**, residents of Grand Prairie, Texas, were the owners of Cyprian Inc., dba Ultimate Care Home

7

Health Services, Inc. ("Ultimate"). Ultimate was a HHA, originally located in Grand Prairie, Texas, and later relocated to Arlington, Texas, doing business in and around Dallas County. Approximately seventy-two percent (72%) of Ultimate's patients were certified for home healthcare services by **Jacques Roy, M.D.** or another Medistat physician.

23.    **Cyprian Akamnonu** and **Patricia Akamnonu, R.N.** submitted fraudulent claims to Medicare for home healthcare services that were not medically necessary. From January 1, 2006 through August 31, 2011, Ultimate submitted claims to Medicare totaling approximately $40,818,658.08 for services for Medicare beneficiaries certified by **Jacques Roy, M.D.** or another Medistat physician.

TERI SIVILS

24.    Defendant **Teri Sivils**, a resident of Midlothian, Texas, was an employee at Medistat beginning in 2002, and was the office manager from 2005 through 2010. **Teri Sivils** was directly responsible for the daily operation of Medistat and ensured that POCs were processed. **Teri Sivils** signed **Jacques Roy, M.D.**'s name to POCs. **Teri Sivils** also supervised the processing of thousands of POCs that contained **Jacques Roy, M.D.**'s electronic signature, and other Medistat physicians' signatures, permitting HHAs to bill Medicare for unnecessary home health services.

25.    **Teri Sivils** accepted cash payments from **Cyprian Akamnonu** in exchange for ensuring that POCs contained the signature of **Jacques Roy, M.D.** or another Medistat physician.

8

CHARITY ELEDA, R.N.

26.     Defendant **Charity Eleda, R.N.**, a resident of Rowlett, Texas, was the co-owner of Charry Home Care Services, Inc. ("Charry").  Charry was a HHA located in Dallas, Texas, doing business in and around Dallas County.  Approximately eighty-one percent (81%) of Charry's patients were certified for home healthcare services by **Jacques Roy, M.D.** or another Medistat physician.

27.     **Charity Eleda, R.N.** submitted fraudulent claims to Medicare for home healthcare services that were not medically necessary.  From June 30, 2010, through June 30, 2011, Charry submitted claims to Medicare totaling approximately $449,969.00 for services for Medicare beneficiaries certified by **Jacques Roy, M.D.** or another Medistat physician.

## COUNT 1
### Conspiracy to Commit Healthcare Fraud
(Violation of 18 U.S.C. § 1349)

28.     Paragraphs 1 through 27 of the General Allegations section of this

Superseding Indictment are realleged and incorporated by reference as though fully set

forth herein.

29.     From in or around November 2004, through in or around February 2012,

the exact dates being unknown to the Grand Jury, in the Dallas Division of the Northern

District of Texas, and elsewhere, defendants,

**Jacques Roy, M.D.**
**Cynthia Stiger**
**Wilbert James Veasey, Jr.**
**Cyprian Akamnonu**
**Patricia Akamnonu, R.N.**
**Teri Sivils**
**Charity Eleda, R.N.**

did knowingly and willfully combine, conspire, confederate and agree with others, known

and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1347,

that is, to execute a scheme and artifice to defraud a health care benefit program affecting

commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare,

and to obtain, by means of materially false and fraudulent pretenses, representations, and

promises, money and property owned by, and under the custody and control of, said

healthcare benefit program, in connection with the delivery of and payment for healthcare

benefits, items, and services.

10

## Purpose of the Conspiracy

30.     It was a purpose of the conspiracy for the defendants to unlawfully enrich themselves by, among other things, (a) submitting and causing the submission of false and fraudulent claims to Medicare and Medicaid for services that were medically unnecessary and not rendered; (b) concealing the submission of false and fraudulent claims to Medicare and Medicaid and the receipt and transfer of the proceeds from the fraud; and (c) diverting the proceeds of the fraud for the personal use and benefit of the defendants and their co-conspirators.

## Manner and Means of the Conspiracy

31.     The manner and means by which the defendants sought to accomplish the purpose of the conspiracy included, among other things:

**A.     The Scheme to Defraud**

32.     **Wilbert James Veasey, Jr.** (Apple), **Patricia Akamnonu, R.N.** (Ultimate), and **Charity Eleda, R.N.** (Charry), and other co-conspirators, known and unknown, recruited Medicare beneficiaries (the "Recruited Beneficiaries") to be placed at their respective HHA so that their respective HHA could bill Medicare for unnecessary home health services.

33.     **Patricia Akamnonu, R.N.** (Ultimate), **Charity Eleda, R.N.** (Charry), and co-conspirator medical professionals at Apple, as well as other co-conspirators, known and unknown to the Grand Jury, would falsify OASISs to make it appear that the beneficiaries recruited by **Wilbert James Veasey, Jr.** (Apple), **Patricia Akamnonu,**

R.N. (Ultimate), and **Charity Eleda, R.N.** (Charry), and other co-conspirators, known and unknown, qualified for home health services that were not medically necessary.

34.     **Patricia Akamnonu, R.N.** (Ultimate), **Charity Eleda, R.N.** (Charry), and co-conspirator medical professionals at Apple, as well as other co-conspirators, known and unknown to the Grand Jury, prepared POCs that were not medically necessary for the Recruited Beneficiaries.

35.     **Cyprian Akamnonu** (Ultimate), **Cynthia Stiger** (Apple), **Charity Eleda, R.N.** (Charry), and co-conspirator employees at Ultimate, Apple and Charry, known and unknown to the Grand Jury, would provide these POCs either by facsimile or hand-delivery to Medistat for **Jacques Roy, M.D.** or another Medistat physician to falsely certify that the Recruited Beneficiaries needed home health care services from their respective HHAs.

36.     **Teri Sivils**, working as the office manager for Medistat, would sign **Jacques Roy, M.D.**'s name to POCs.  **Teri Sivils** would also supervise the process by which thousands of POCs would be approved using **Jacques Roy, M.D.**'s electronic signature.

37.     Co-conspirator nurses at Apple, Ultimate and Charry, and other co-conspirators, known and unknown to the Grand Jury, would write visit notes to make it appear that they provided skilled nursing to the Recruited Beneficiaries when no skilled nursing was provided.

38.     At the conclusion of the initial 60-day episode of care covered by the

POCs, the co-conspirators would engage in the same conduct as alleged above so that the

Recruited Beneficiaries could receive additional episodes of care.

39.     **Jacques Roy, M.D.**, and other co-conspirators, known and unknown to the

Grand Jury, would perform medically unnecessary home visits and order unnecessary

medical services for the Recruited Beneficiaries.

40.     Co-conspirators at Medistat, known and unknown to the Grand Jury, would

submit fraudulent claims to Medicare for certifying and recertifying beneficiaries for

unnecessary home health services, for unnecessary home visits, and other unnecessary

medical services.

**B.      Medistat's Fraudulent Business Model**

41.     Medistat received hundreds of POCs and/or requests for physician orders

for home health services per day from HHAs.  In order to process this volume of

paperwork, Medistat maintained a "485 Department," named for the form on which the

POC was documented.  **Jacques Roy, M.D.** instructed Medistat employees to complete

the 485s by either signing his name by hand or by affixing his electronic signature to the

document.  Each completed POC indicated that the beneficiary was under the care of

**Jacques Roy, M.D.** or another Medistat physician and that the beneficiary was

homebound and in need of skilled nursing services.

42.     By processing the paperwork in this manner, Medistat was able to bill

Medicare for certifying and recertifying beneficiaries for unnecessary home health

13

services, for unnecessary home visits, and other unnecessary medical services.

43.     When Medistat completed a POC for a beneficiary, **Jacques Roy, M.D.** made that beneficiary a Medistat patient.  Once a beneficiary became a Medistat patient, Medistat employees acting under the direction of **Jacques Roy, M.D.** would make home visits to that beneficiary, provide unnecessary medical services and order unnecessary durable medical equipment for that beneficiary.  Medistat would then bill Medicare for those visits and services.

44.     The funds paid by Medicare to Medistat for those home visits and medical services were paid into a single account controlled by **Jacques Roy, M.D.** (the "Medistat Account") and he would pay the employees acting at his direction an agreed upon amount out of the Medistat Account based on the number of beneficiaries they visited.

45.     In total, between January 1, 2006 and November 30, 2011, the 485 Department, directed by **Jacques Roy, M.D.**, processed and approved POCs for more than 11,000 unique Medicare beneficiaries from more than 500 different HHAs.  Many of these Medicare beneficiaries had primary care physicians who never certified home healthcare services for them.

46.     In sum, Medistat's fraudulent business model was to use the HHAs as recruiters for its own practice so that Medistat could bill unnecessary home visits and unnecessary medical services for the beneficiaries that **Jacques Roy, M.D.** and other Medistat physicians certified for home health services.

14

47.     In November 2004, **Jacques Roy, M.D.** told J.A., Medistat's business manager, that **Cynthia Stiger** and **Wilbert James Veasey, Jr.** (Apple) gave Medicare beneficiaries cash and groceries to get them to sign up for home healthcare services with Apple.

48.     J.A. also recorded several conversations between himself and **Jacques Roy, M.D.** in January 2006.  The conversations concerned a disagreement between J.A. and **Jacques Roy, M.D.** regarding a HHA technically owned by J.A. but financed by **Jacques Roy, M.D.**  In the recorded conversation, J.A. argued that **Cynthia Stiger** and **Wilbert James Veasey, Jr.** (Apple) were "shady" and that he never agreed to their involvement in the HHA.  **Jacques Roy, M.D.** insisted that **Cynthia Stiger** and **Wilbert James Veasey, Jr.** were always part of the HHA's business plan and stated "James and Cynthia would have half the profits because they'll bring patients in."

49.     J.A. continued to argue with **Jacques Roy, M.D.** suggesting that Medistat should invest in legitimate marketing rather than working with **Cynthia Stiger** and **Wilbert James Veasey, Jr.** (Apple).  In response, **Jacques Roy, M.D.** stated "... I've done enough marketing to know it's bullshit, and I don't want to do it."

50.     By virtue of its fraudulent business model, Medistat was able to bill approximately $27 million to Medicare and Medicaid for unnecessary home visits and unnecessary medical services from January 1, 2006 through February 28, 2012.

**C.    Arrangements between JACQUES ROY, M.D. and the HHAs**

51.    In order to ensure that his fraudulent business model worked and that he had a steady stream of Medicare beneficiaries for whom to bill, **Jacques Roy, M.D.** entered into formal and informal fraudulent arrangements with HHAs including Apple, Ultimate and Charry.

i.    Apple

52.    On or about January 7, 2006, **Jacques Roy, M.D.** entered into a secret agreement with **Cynthia Stiger** and **Wilbert James Veasey, Jr.** where he would pay all of the operating expenses for Apple in return for fifty-percent (50%) of the profits Apple made from billing Medicare for home health services.

53.    Between January 2006 and November 2006, **Jacques Roy, M.D.** paid **Cynthia Stiger** and **Wilbert James Veasey, Jr.** approximately $350,000 in amounts ranging from $2,000 to $40,000.  **Cynthia Stiger** and **Wilbert James Veasey, Jr.**, in turn, made payments to **Jacques Roy, M.D.** from the money Apple made from billing Medicare for unnecessary home health services.  During the time period that **Jacques Roy, M.D.** was paying Apple's operating expenses, almost all of Apple's patients were certified for home healthcare by **Jacques Roy, M.D.** or another Medistat physician.

54.    From January 1, 2006 through July 31, 2011, approximately sixty-nine percent (69%) of Apple's patients were certified by **Jacques Roy, M.D.** or another Medistat physician for home health services and Medistat incorporated these patients into its practice.

55.    From January 1, 2006 through July 31, 2011, Apple submitted claims to Medicare totaling approximately $9,282,680.07 for home health services for Medicare beneficiaries certified by **Jacques Roy, M.D.** or another Medistat physician and **Jacques Roy, M.D.** and Medistat submitted approximately $1,088,495.74 to Medicare for services for these beneficiaries.

ii.    <u>Ultimate</u>

56.    In or about January 2006, **Jacques Roy, M.D.** entered into an arrangement with Ultimate and its owners **Patricia Akamnonu, R.N.** and **Cyprian Akamnonu**.

57.    **Patricia Akamnonu, R.N.** recruited Medicare beneficiaries for Ultimate by approaching people and promising free health care and other social services such as food stamps. **Patricia Akamnonu, R.N.** would record the person's information, including Medicare number, and then sign that person up for home healthcare services – sometimes without their knowledge.

58.    **Patricia Akamnonu, R.N.** and **Cyprian Akamnonu** then would have **Jacques Roy, M.D.** or another Medistat physician certify that the beneficiary needed home health services from Ultimate.

59.    To facilitate the certifications, and with **Jacques Roy, M.D.**'s knowledge, **Cyprian Akamnonu** paid cash kickbacks to **Teri Sivils**, the Medistat office manager. **Jacques Roy, M.D.** instructed **Teri Sivils** to provide "special treatment" to Ultimate and to be personally responsible for Ultimate patient certifications.

60.     From January 1, 2006 through August 31, 2011, approximately seventy-two percent (72%) of Ultimate patients were certified by **Jacques Roy, M.D.** or another Medistat physician for home health services and Medistat incorporated these patients into its practice.

61.     From January 1, 2006 through August 31, 2011, Ultimate submitted claims to Medicare totaling approximately $40,818,658.08 for home health services for Medicare beneficiaries certified by **Jacques Roy, M.D.** or another Medistat physician and **Jacques Roy, M.D.** and Medistat submitted approximately $2,314,447.88 to Medicare for services for these beneficiaries.

iii.     Charry

62.     During the fall of 2010, **Charity Eleda, R.N.** (Charry) visited The Bridge Homeless Shelter ("The Bridge") in Dallas, Texas to recruit homeless beneficiaries who were staying there ("guests").

63.     **Charity Eleda, R.N.** hired recruiters to find guests with Medicare benefits and to direct them to her vehicle parked outside the gates of The Bridge. **Charity Eleda, R.N.** paid the recruiters $50 per beneficiary. Any treatment that **Charity Eleda, R.N.** provided was either in her vehicle, in the courtyard of The Bridge, on a park bench outside of The Bridge, or on the second floor of a church located several blocks away from The Bridge.

64.     **Charity Eleda, R.N.** sent by facsimile certification paperwork to Medistat and called **Jacques Roy, M.D.** to come to The Bridge and meet with the beneficiaries.

18

**Jacques Roy, M.D.** came to The Bridge and conducted a medical examination of the allegedly homebound beneficiaries. **Jacques Roy, M.D.** conducted his medical examinations inside The Bridge at a courtyard picnic table and at the Austin Street Shelter, another homeless facility located in downtown Dallas. **Jacques Roy, M.D.** certified the beneficiaries as being homebound and in need of skilled nursing services to be provided by **Charity Eleda, R.N.** and Charry.

65. **Charity Eleda, R.N.**, and other nurses employed by Charry, attempted to visit guests of The Bridge during the 60-day certification period approved by **Jacques Roy, M.D. Charity Eleda, R.N.** was informed, however, by security guards at The Bridge that she was not permitted to treat guests on or near the premises, and that The Bridge had a Parkland Hospital medical clinic inside the gates that was available to the guests. After being removed from The Bridge on several occasions, **Charity Eleda, R.N.** began to see the allegedly homebound beneficiaries on the second floor of a church located several blocks away from The Bridge.

66. From June 30, 2010, through June 30, 2011, approximately eighty-one percent (81%) of Charry patients were certified by **Jacques Roy, M.D.** or another Medistat physician for home healthcare services and Medistat incorporated these patients into its practice.

67. From June 30, 2010, through June 30, 2011, Charry submitted claims to Medicare totaling approximately $449,969.00 for home health services for Medicare beneficiaries certified by **Jacques Roy, M.D.** or another Medistat physician and **Jacques**

19

Roy, M.D. and Medistat submitted approximately $59,252.29 to Medicare for services for these beneficiaries.

**D.     Medistat's Suspension from Medicare**

68.     Medistat's fraudulent business model was threatened in June 2011, when CMS suspended **Jacques Roy, M.D.** and Medistat from the Medicare program based on credible allegations of fraud.

69.     In order to ensure that Medistat could continue operating, and in furtherance of the overall conspiracy, after the suspension, **Jacques Roy, M.D.** directed that the physicians and nurse practitioners associated with Medistat (other than himself) be re-credentialed and bill Medicare under the provider number for a separate company called Medcare HouseCalls LLC ("Medcare HouseCalls").

70.     Despite the fact that the physicians and nurse practitioners associated with Medistat were billing under a different provider number, they continued to be paid by Medistat and **Jacques Roy, M.D.** supervised and controlled their daily activities.

71.     **Jacques Roy, M.D.** also directed that all monies received by Medcare HouseCalls from Medicare for the services rendered by Medistat's physicians and nurse practitioners be transferred to Medistat.  In this way, he was able to circumvent CMS's suspension and ensure that he and Medistat continued to receive Medicare reimbursement funds despite their inability to bill Medicare directly.  From July 2011, through December 2011, Medistat billed Medicare in excess of $2 million through Medcare HouseCalls.

All in violation of Title 18, United States Code, Section 1349.

20

## COUNTS 2-11
Healthcare Fraud
(18 U.S.C. §§ 1347 and 2)

72.     Paragraphs 1 through 27 and 31 through 71 of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

73.     On or about the dates specified below, in the Dallas Division of the Northern District of Texas, and elsewhere, defendants

**Jacques Roy, M.D.**
**Wilbert James Veasey, Jr.**
**Patricia Akamnonu, R.N.**
**Charity Eleda, R.N.**

in connection with the delivery and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud Medicare, a health care benefit program affecting commerce, as defined by Title 19, United States Code, Section 24(b), and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, Medicare, that is, the defendants submitted and aided and abetted in submitting false and fraudulent claims to Medicare, seeking reimbursement for the cost of various unnecessary home health services.

| Count | Defendants | HHA | Medicare Beneficiary | Approximate Dates | Conduct | Appx. Amount Submitted to Medicare and Medicaid |
|---|---|---|---|---|---|---|
| 2 | **Jacques Roy, M.D.** and **Wilbert James Veasey, Jr.** | Apple | D.T. | August 2009 to October 2009 | Recruitment and home health certification for 60-day episode of care | $2,996.74 |
| 3 | **Jacques Roy, M.D.** and **Wilbert James Veasey, Jr.** | Apple | C.B. | May 2010 to July 2010 | Recruitment and home health certification for 60-day episode of care | $1,815.74 |
| 4 | **Jacques Roy, M.D.** and **Wilbert James Veasey, Jr.** | Apple | C.M.B. | May 2010 to July 2010 | Recruitment and home health certification for 60-day episode of care | $1,196.74 |
| 5 | **Jacques Roy, M.D.** and **Patricia Akamnonu, R.N.** | Ultimate | L.S. | May 2007 to July 2007 | Recruitment and home health certification for 60-day episode of care | $4,689.77 |
| 6 | **Jacques Roy, M.D.** and **Patricia Akamnonu, R.N.** | Ultimate | B.L. | July 2009 to September 2009 | Recruitment and home health certification for 60-day episode of care | $1,320.71 |
| 7 | **Jacques Roy, M.D.** and **Patricia Akamnonu, R.N.** | Ultimate | V.O. | February 2008 to April 2008 | Recruitment and home health certification for 60-day episode of care | $2,909.76 |

| Count | Defendants | HHA | Medicare Beneficiary | Approximate Dates | Conduct | Appx. Amount Submitted to Medicare and Medicaid |
|---|---|---|---|---|---|---|
| 8 | **Jacques Roy, M.D.** and **Charity Eleda, R.N.** | Charry | P.W. | September 2010 to November 2010 | Recruitment and home health certification for 60-day episode of care | $1,615.95 |
| 9 | **Jacques Roy, M.D.** and **Charity Eleda, R.N.** | Charry | S.C. | September 2010 to November 2010 | Recruitment and home health certification for 60-day episode of care | $1,061.56 |
| 10 | **Jacques Roy, M.D.** and **Charity Eleda, R.N.** | Charry | R.S. | October 2010 to December 2010 | Recruitment and home health certification for 60-day episode of care | $2,251.56 |
| 11 | **Jacques Roy, M.D.** and **Charity Eleda, R.N.** | Charry | K.F | September 2010 to November 2010 | Recruitment and home health certification for 60-day episode of care | $1,726.12 |

Each in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNTS 12-14
### False Statements for Use in
### Determining Rights for Benefit and Payment by Medicare
### (42 U.S.C. § 1320a-7b(a)(2))

74.     Paragraphs 1 through 27 of the General Allegations section of this

Superseding Indictment are realleged and incorporated by reference as though fully set

forth herein.

75.     On or about the dates enumerated below, in the Dallas Division of the

Northern District of Texas, and elsewhere, the defendant,

**Charity Eleda, R.N.**

did knowingly and willfully make and cause to be made false statements and

representations of material facts in patient files for the beneficiaries set forth below, for

use in determining rights for any benefit and payment under a Federal healthcare

program, that is, Medicare, to wit, that she provided skilled nursing when in fact she was

outside of the United States:

| Count | Medicare Beneficiary | Date of Nursing Visit | False Statement and Representation | Appx. Amount Submitted to Medicare |
|---|---|---|---|---|
| 12 | R.G. | February 8, 2011 | Skilled Nursing Visit in Dallas | $200 |
| 13 | I.S. | February 9, 2011 | Skilled Nursing Visit in Dallas | $200 |
| 14 | R.G. | February 15, 2011 | Skilled Nursing Visit in Dallas | $200 |

Each in violation of Title 42, United States Code, Section 1320a-7b(a)(2)

and Title 18, United States Code, Section 2.

## COUNTS 15-16
### False Statements Relating to Healthcare Matters
### (18 U.S.C. § 1035)

76.     Paragraphs 1 through 27 of the General Allegations section of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

77.     On or about the dates enumerated below, in the Dallas Division of the Northern District of Texas, and elsewhere, the defendant,

### JACQUES ROY, M.D.

did knowingly and willfully conceal material facts by scheme, and made materially false, fictitious, and fraudulent statements and representations, in claims submissions for services purportedly rendered to the beneficiaries set forth below, in connection with the delivery of and payment for health care benefits under Medicare, to wit, that those services were rendered by a physician or nurse practitioner unassociated with the suspended provider Medistat:

| Count | Medicare Beneficiary | Date of Service | Appx. Amount Submitted to Medicare |
|:---:|:---:|:---:|:---:|
| 15 | B.S. | November 30, 2011 | $209 |
| 16 | C.W. | November 9, 2011 | $209 |

Each in violation of Title 18, United States Code, Sections 1035 and 2.

COUNT 17
Obstruction of Justice
(18 U.S.C. § 1505)

78.     Paragraphs 1 through 27 of the General Allegations section of this

Superseding Indictment are realleged and incorporated by reference as though fully set

forth herein.

79.     On or about June 23, 2011, in the Dallas Division of the Northern District

of Texas, and elsewhere, the defendant,

**JACQUES ROY, M.D.**

did corruptly obstruct and impede the due and proper administration of the law under

which a pending proceeding to investigate allegations of fraud was being had before

CMS, by directing Medistat employees to bill Medicare for home visits using the

provider number of a company called Medcare HouseCalls, so that he and Medistat could

continue to receive Medicare reimbursement funds despite being on notice that Medistat

was the subject of a pending proceeding and suspended from receiving Medicare monies

by CMS.

In violation of Title 18, United States Code, Section 1505 and 2.

## NOTICE OF CRIMINAL FORFEITURE
(18 U.S.C. § 982(a)(7))

Upon conviction for any of the offenses charged in Counts 1-17 of this Superseding Indictment, the defendants, **Jacques Roy, M.D., Cynthia Stiger, Wilbert James Veasey, Jr., Cyprian Akamnonu, Patricia Akamnonu, R.N., Teri Sivils,** and **Charity Eleda, R.N.,** shall, pursuant to 18 U.S.C. §982(a)(7), forfeit to the United States all property, real or personal, constituting or derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, including, but not limited to, the following:

Property to be forfeited by Jacques Roy. M.D.

    a.    $179,070.36 from business checking account XXXX8914 in the name of Medistat Group Associates at Bank of America.

    b.    $167,801.51 from business checking account XXXX9921 in the name of Medistat Group Associates at Capital One, N.A.

    c.    $46,115.29 from personal checking account XXXX1176 in the name of Jacques Roy at Bank of America.

    d.    2009 Melges sailboat, USMEB20118L809, "One Trick Pony", with trailer, VIN 1S9A4231691562007.

    e.    2008 Flying Scot sailboat, hull ID GDB04468G808, with Trailex trailer.

    f.    2007 Toyota Avalon, VIN 4T1BK36B47U192647.

    g.    2009 Buick Enclave, VIN 5GAER23D09J165416.

    h.    $160,582.15 from account XX7659 for Jacques Roy with American Equity Investment Life Insurance Company.

    i.    $796,300.98 from account XXXX8147 for Jacques Roy with Allianz Life Insurance Company.

j. $449,865.78 from account XXXX0518 for Jacques Roy with Mass Mutual Financial Group.

k. $200,963.18 from account XXXX0508 for Jacques Roy with Mass Mutual Financial Group.

l. $56,014.96 from account VF5148XXXX for Jacques Roy with Pacific Life Insurance Company.

m. $260,959.47 from account XXX293x for Jacques Roy with Life Insurance Company of the Southwest.

n. $49,353.33 from account VF5148XXXX for Louise Lamarre with Pacific Life Insurance Company.

o. $68,288.37 from Northern Trust Company accounts 204XXXX and 31304XXXX in the name of Cheshire Ltd.

p. $120,578.35 from business checking account 291622XXXX at Bank of America, Irving, Texas, in the name of Quebec Corporate, Ltd.

Property to be forfeited by Cyprian Akamnonu And Patricia Akamnonu, R.N.

q. $16,706.62 from business checking accounts XXXXXXXX0011, XXXXXXXX3153, and XXXXXXXX0759 in the name of Cyprian Inc., dba Ultimate Care Home Health Services at Bank of America.

r. $497.13 from personal accounts XXXXXXXX7508, XXXXXXXX1411, and XXXXXXXX2847 in the name of Cyprian and Patricia Akamnonu at Bank of America.

s. 2010 Nissan Murano, VIN JN8AZ1MU0AW007045.

t. 2006 Infiniti FX35, VIN JNRAS08W26X202720.

u. 2008 Nissan Titan, VIN 1N6BA07C48N332766.

v. 2010 Mercedes GL5, VIN 4JGBF8GE0AA609720.

w. The real property located at 8016 Alex David Circle, Dallas, Texas 75237.

x.      The real property located at 7130 Sorcey Road, Dallas, Texas 75249.

y.      The real property located at 9620 Michelle Drive, Dallas, Texas 75271.

z.      The real property located at 9602 Whistler Drive, Dallas, Texas 75217.

aa.     The real property located at 552 Palomino Way, Grand Prairie, Texas 75052.

bb.     The real property located at 8054 Genesis, Dallas, Texas 75232.

cc.     The real property located at 8017 Alex David Circle, Dallas, Texas 75237.

dd.     The real property located at 8022 Roger Hollow Circle, Dallas, Texas 75232.

ee.     The real property located at 8419 Widgeon Way, Dallas, Texas 75249.

ff.     The real property located at 8441 Canvasback Lane, Dallas, Texas 75249.

gg.     The real property located at 9623 Michelle Drive, Dallas, Texas 75271.

hh.     The real property located at 5915 Alcova Lane, Dallas, Texas 75249.

ii.     The real property located at 2913 Sand Dollar Ct., Cedar Hill, Texas 75104.

jj.     $54,761.50 received in substitution for the real property located at 2846 Traildust, Dallas, Texas 75237.

kk.     The real property located at 1112 Lily, Cedar Hill, Texas 75104.

ll.     The real property located at 3163 Sanctuary, Grand Prairie, Texas 75052.

mm.     The real property located at 1609 Mustang Court, Cedar Hill, Texas 75104.

nn.     The real property located on Avenue K, Plano, Texas 75074, more specifically described by legal description ABS A0738 Daniel Rowlett Survey BLK 3 Tract 59.

oo.     The real property located at Avenue K, Plano, Texas 75074, more specifically described by legal description ABS A0738 Daniel Rowlett Survey BLK 3 Tract 60.

pp.     The real property located at 2811 Park Springs Drive, Grand Prairie, Texas 75052.

qq.     The real property located at 1907 Pikes Peak, Midlothian, Texas 76065.

Property to be forfeited by Charity Eleda, R.N.

rr.     $16,471.82 from business checking account xxxx8253 in the name of Charry Home Care Services, Inc. at Compass Bank.

Pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1), if any of the above-referenced property subject to forfeiture, as a result of any act or omission of any of the defendants, cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third person; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be subdivided without difficulty, it is the intent of the United States of America to seek forfeiture of any other property of that defendant up to the value of the previously-described property subject to forfeiture.

A TRUE BILL

FOREPERSON

SARAH R. SALDAÑA
UNITED STATES ATTORNEY

MICHAEL C. ELLIOTT
Assistant United States Attorney
New York Bar
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214.659.8600
Facsimile: 214.659.8812

MINDY SAUTER
Assistant United States Attorney
Texas Bar No. 24033114
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214.659.8600
Facsimile: 214.659.8812

SAM SHELDON
Deputy Chief
U.S. Department of Justice, Criminal Division, Fraud Section
California Bar No. 190502
Telephone: 202.412.9770

BENJAMIN O'NEIL
Trial Attorney
U.S. Department of Justice Criminal Division, Fraud Section
D.C. Bar No. 500796
Telephone: 202.615.1272

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

---

UNITED STATES OF AMERICA

V.

JACQUES ROY, M.D. (1)
CYNTHIA STIGER (2)
WILBERT JAMES VEASEY, JR. (3)
CYPRIAN AKAMNONU (4)
PATRICIA AKAMNONU, R.N. (5)
TERI SIVILS (6)
CHARITY ELEDA, R.N. (7)

---

## SUPERSEDING INDICTMENT

18 U.S.C. § 1349
Conspiracy to Commit Healthcare Fraud

18 U.S.C. §§1347 and 2
Healthcare Fraud

42 U.S.C. § 1320a-7b(a)(2)
False Statements for Use in
Determining Rights for Benefit and Payment by Medicare

18 U.S.C. §1035
False Statements Relating to Healthcare Matters

18 U.S.C. §1505
Obstruction of Justice

18 U.S.C. § 982(a)(7)
Forfeiture Notice

17 Counts

A true bill rendered:

_____                                    _Andrew L. Tuggle_
DALLAS                                                                                          FOREPERSON

Filed in open court this __6th__ day of ___September___, A.D. 2012.

_____                     Clerk

--------------------------------------------------------------------------------

**JACQUES ROY, M.D. - In Federal Custody**
**CYNTHIA STIGER - WARRANT TO BE ISSUED**
**WILBERT JAMES VEASEY, JR. -WARRANT TO BE ISSUED**
**CYPRIAN AKAMNONU - In Federal Custody**
**PATRICIA AKAMNONU, R.N. - In Federal Custody**
**TERI SIVILS - WARRANT TO BE ISSUED**
**CHARITY ELEDA, R.N. - WARRANT TO BE ISSUED**
--------------------------------------------------------------------------------

_____
UNITED STATES DISTRICT/MAGISTRATE JUDGE
Criminal No. 3:12-CR-054-L

Magistrate Case No.
    **JACQUES ROY, M.D.** (SEALED - 3:11-MJ-237
                                      3:11-MJ-238
                                      3:11-MJ-239
                                      3:11-MJ-240
                                      3:11-MJ-226

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

| Related Case Information |
| --- |
| Superseding Indictment: __X__ Yes ____ No New Defendant: ___ Yes __X__ No |
| Pending CR Case in NDTX: __X__ Yes ___ No If yes, CR #: 3:12-CR-054-L |
| Search Warrant Case Number: **(Sealed)**: 3-11-MJ-237; 3-11-MJ-238; 3-11-MJ 239; 3-11-MJ-240; Seizure **(Sealed)**: 3-11-MJ- 226) |
| Rule 20 from District of: _____ |
| Magistrate Case Number: (Same As Above) _____ |

**1.**  **Defendant Information**

Juvenile: ☐ Yes ☒ No

Matter to be sealed:

☐ Yes  ☒ No

Defendant Name _____ JACQUES ROY, M.D. (1) _____

Alias Name _____

Address _____

**ORIGINAL**

County in which offense was committed: _____ DALLAS _____

**RECEIVED**

**SEP - 6 2012**

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**2.**  **U.S. Attorney Information**

MICHAEL ELLIOTT                    Bar # NY

**3.**  **Interpreter**

☐ Yes ☒ No    If Yes, list language and/or dialect: _____

**4.**  **Location Status**

☒ Already in Federal Custody
☐ Already in State Custody
☐ On Pretrial Release

**5.**  **U.S.C. Citations**

Total # of Counts as to This Defendant:   14    ☐ Petty ☐ Misdemeanor ☒ Felony

| Citation | Description of Offense Charged | Count(s) |
| --- | --- | --- |
| 18 U.S.C. § 1349 | Conspiracy to Commit Healthcare Fraud | 1 |
| 18 U.S.C. §§ 1347 and 2 | Healthcare Fraud | 2-11 |
| 18 U.S.C. § 1035 | False Statements Relating to Healthcare Matters | 15-16 |
| 18 U.S.C. § 1505 | Obstruction of Justice | 17 |
| 18 U.S.C. § 982(a)(7) | Forfeiture Notice | |

Date _____    Signature of AUSA: _____

MICHAEL ELLIOTT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

**Related Case Information**

Superseding Indictment:  X Yes___ No New Defendant: __Yes   X No

Pending CR Case in NDTX:   X Yes   ___ No If yes, CR #: 3:12-CR-054-L

Search Warrant Case Number:_____

Rule 20 from District of: _____

Magistrate Case Number:_____

1.   **Defendant Information**

Juvenile: ☐ Yes [X] No

Matter to be sealed:

☐ Yes [X] No

Defendant Name         CYNTHIA STIGER (2)

Alias Name

Address

ORIGINAL

County in which offense was committed:         DALLAS

RECEIVED

SEP - 6 2012

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

2.   **U.S. Attorney Information**

MICHAEL ELLIOTT                    Bar # NY

3.   **Interpreter**

☐ Yes [X] No    If Yes, list language and/or dialect: _____

4.   **Location Status - WARRANT TO BE ISSUED**

☐ Already in Federal Custody
☐ Already in State Custody
[X] On Pretrial Release

5.   **U.S.C. Citations**

Total # of Counts as to This Defendant:   1       ☐ Petty   ☐ Misdemeanor   [X] Felony

| Citation | Description of Offense Charged | Count(s) |
|---|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Healthcare Fraud | 1 |
| 18 U.S.C. § 982 (a)(7) | Forfeiture Notice | |

Date _____        Signature of AUSA:

MICHAEL ELLIOTT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

**Related Case Information**

Superseding Indictment:  X Yes___No New Defendant: __Yes  _X_No

Pending CR Case in NDTX:  _X_Yes  ___No If yes, CR #: 3:12-CR-054-L

Search Warrant Case Number:_____

Rule 20 from District of: _____

Magistrate Case Number:_____

1.   **Defendant Information**

Juvenile: ☐ Yes ☒ No

Matter to be sealed:

☐ Yes ☒ No

Defendant Name _____WILBERT JAMES VEASEY, JR.  (3)_____

Alias Name _____

Address _____

_____

County in which offense was committed: _____DALLAS_____

2.   **U.S. Attorney Information**

MICHAEL ELLIOTT                     Bar # NY

**ORIGINAL**

**RECEIVED**

SEP - 6 2012

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

3.   **Interpreter**

☐ Yes ☒ No   If Yes, list language and/or dialect:_____

4.   **Location Status WARRANT TO BE ISSUED**

☐ Already in Federal Custody as of _____ in _____
☐ Already in State Custody
☒ On Pretrial Release

5.   **U.S.C. Citations**

Total # of Counts as to This Defendant:   4        ☐ Petty    ☐ Misdemeanor    ☒ Felony

| Citation | Description of Offense Charged | Count(s) |
|---|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Healthcare Fraud | 1 |
| 18 U.S.C. §§ 1347 and 2 | Healthcare Fraud | 2-4 |
| 18 U.S.C. § 982(a)(7) | Forfeiture Notice | |

Date _____        Signature of AUSA: _____

MICHAEL ELLIOTT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

**Related Case Information**

Superseding Indictment:  __X__ Yes ___ No New Defendant: __ Yes  __X__ No

Pending CR Case in NDTX:  __X__ Yes  ___ No If yes, CR #:3:12-CR-054-L

Search Warrant Case Number:_____

Rule 20 from District of: _____

Magistrate Case Number:_____

1.   **Defendant Information**

Juvenile: ☐ Yes ☒ No

Matter to be sealed:

☐ Yes  ☒ No

Defendant Name    CYPRIAN AKAMNONU (4)

Alias Name    _____

Address    _____

County in which offense was committed:    DALLAS

2.   **U.S. Attorney Information**

MICHAEL ELLIOTT    Bar # NY

**ORIGINAL**

3.   **Interpreter**

☐ Yes ☒ No    If Yes, list language and/or dialect:

RECEIVED

SEP - 6 2012

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

4.   **Location Status**

☒ Already in Federal Custody
☐ Already in State Custody
☐ On Pretrial Release

5.   **U.S.C. Citations**

Total # of Counts as to This Defendant:   1    ☐ Petty   ☐ Misdemeanor   ☒ Felony

| Citation | Description of Offense Charged | Count(s) |
|---|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Healthcare Fraud | 1 |
| 18 U.S.C. § 982(a)(7) | Forfeiture Notice | |

Date _____    Signature of AUSA: _____

MICHAEL ELLIOTT

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS

**Related Case Information**

Superseding Indictment:  X Yes___ No New Defendant: __Yes  X  No

Pending CR Case in NDTX:  X Yes ___No If yes, CR #: 3:12-CR-054-L

Search Warrant Case Number:_____

Rule 20 from District of: _____

Magistrate Case Number:_____

1. **Defendant Information**

Juvenile: ☐ Yes ☒ No

Matter to be sealed:

☐ Yes ☒ No

Defendant Name ___PATRICIA AKAMNONU, R.N. (5)___

Alias Name _____

Address _____

County in which offense was committed: ___DALLAS___

2. **U.S. Attorney Information**

MICHAEL ELLIOTT      Bar # NY

ORIGINAL

RECEIVED

SEP -6 2012

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

3. **Interpreter**

☐ Yes ☒ No    If Yes, list language and/or dialect:_____

4. **Location Status**

☒ Already in Federal Custody
☐ Already in State Custody
☐ On Pretrial Release

5. **U.S.C. Citations**

Total # of Counts as to This Defendant:  4    ☐ Petty  ☐ Misdemeanor  ☒ Felony

| Citation | Description of Offense Charged | Count(s) |
|---|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Healthcare Fraud | 1 |
| 18 U.S.C. §§ 1347 and 2 | Healthcare Fraud | 5-7 |
| 18 U.S.C. § 982(a)(7) | Forfeiture Notice | |

Date _____    Signature of AUSA:

MICHAEL ELLIOTT

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS

| Related Case Information |
|---|
| Superseding Indictment:  X Yes___No New Defendant: __Yes   X No |
| Pending CR Case in NDTX:  X Yes   ___No If yes, CR #:3:12-CR-054-L |
| Search Warrant Case Number:_____ |
| Rule 20 from District of: _____ |
| Magistrate Case Number:_____ |

1. **Defendant Information**

Juvenile: ☐ Yes ☒ No

Matter to be sealed:

☐ Yes   ☒ No

Defendant Name _____TERI SIVILS (6)_____

Alias Name _____

Address _____

_____

County in which offense was committed: _____DALLAS_____

2. **U.S. Attorney Information**

MICHAEL ELLIOTT                    Bar # NY_____

3. **Interpreter**

☐ Yes ☒ No    If Yes, list language and/or dialect: ~~ORIGINAL~~

RECEIVED

SEP – 6 2012

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

4. **Location Status WARRANT TO BE ISSUED**

☐ Already in Federal Custody
☐ Already in State Custody
☒ On Pretrial Release

5. **U.S.C. Citations**

Total # of Counts as to This Defendant:    1         ☐ Petty   ☐ Misdemeanor   ☒ Felony

| **Citation** | **Description of Offense Charged** | **Count(s)** |
|---|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Healthcare Fraud | 1 |
| 18 U.S.C. § 982(a)(7) | Forfeiture Notice | |

Date _____         Signature of AUSA: _____

MICHAEL ELLIOTT

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS

**Related Case Information**

Superseding Indictment:   _X_ Yes ___ No New Defendant: ___ Yes _X_ No

Pending CR Case in NDTX:   _X_ Yes ___ No If yes, CR #:3:12-CR-054-L

Search Warrant Case Number:_____

Rule 20 from District of: _____

Magistrate Case Number:_____

1. **Defendant Information**

   Juvenile: ☐ Yes  ☒ No

   Matter to be sealed:

   ☐ Yes  ☒ No

   Defendant Name ___CHARITY ELEDA  (7)_____

   Alias Name _____

   Address _____

   _____

   County in which offense was committed: ___DALLAS_____

2. **U.S. Attorney Information**

   MICHAEL ELLIOTT                    Bar # NY _____

3. **Interpreter**

   ☐ Yes  ☒ No    If Yes, list language and/or dialect: **ORIGINAL**

4. **Location Status WARRANT TO BE ISSUED**

   ☐ Already in Federal Custody

   ☐ Already in State Custody

   ☒ On Pretrial Release

RECEIVED

SEP - 6 2012

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

5. **U.S.C. Citations**

   Total # of Counts as to This Defendant:  8      ☐ Petty   ☐ Misdemeanor   ☒ Felony

| Citation | Description of Offense Charged | Count(s) |
|---|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Healthcare Fraud | 1 |
| 18 U.S.C. §§ 1347 and 2 | Healthcare Fraud | 8-11 |
| 42 U.S.C. § 1320a-7b(a)(2) | False Statements for Use in Determining Rights for Benefit and Payment by Medicare | 12-14 |
| 18 U.S.C. § 982(a)(7) | Forfeiture Notice | |

Date _____      Signature of AUSA:_____

MICHAEL ELLIOTT